POLCZYNSKI *v.* NOWICKI.

1. LANDLORD AND TENANT—OPTION TO PURCHASE—TENDER — EVIDENCE—SUFFICIENCY.

In a suit for the specific performance of an option to purchase given in a lease, evidence *held*, to show a legal tender according to the terms of the option.

2. SAME—LESSOR HELD TO HAVE KNOWLEDGE OF OPTION IN LEASE.

Lessor's contention that she did not fully understand that she was signing an option giving the lessee a right to purchase at a certain price, and that she thought it was simply a lease, *held*, not sustained by the record, which shows that she was fully advised as to the nature and effect of said option.

3. EVIDENCE—WRITTEN INSTRUMENTS—BEST EVIDENCE RULE.

A written lease deliberately executed containing an option to the lessee to purchase the leased premises *held*, the best evidence of what the agreement was, and should control.

4. VENDOR AND PURCHASER—FAILURE TO SPECIFY INTEREST DID NOT INVALIDATE OPTION.

> Failure of an option to purchase to specify interest on the deferred payments, *held*, not to invalidate the option.

5. SAME—POSSESSION.

> Where a contract for the purchase of land fails to provide for possession, the purchaser is not entitled to possession until the full purchase price is paid.

6. LANDLORD AND TENANT — TENDER UNDER OPTION CLAUSE DID NOT CHANGE CHARACTER OF POSSESSION.

> A tender by the lessee of the down payment and a land contract providing terms for the payment of the balance of the purchase price pursuant to the option clause in his lease did not change the character of his possession from that of lessee to vendee, where the lease did not so provide.

7. SAME—LESSEE IN ARREARS ENTITLED TO CONTINUE ON PAYMENT WHERE NOT DISPOSSESSED.

> Where the lessee after tender under the option clause in his lease erroneously discontinued the payment of rent, but the lessor has not dispossessed him therefor, he is entitled upon payment of rent in arrears to continue his tenancy under the lease.

8. SAME—SUIT FOR SPECIFIC PERFORMANCE OF OPTION DID NOT TERMINATE LEASE.

> Lessor's contention that lessee's attitude in suit for specific performance of the option clause in his lease terminated the lease, *held*, not tenable.

9. SAME—LESSEE ENTITLED TO CONTRACT UNDER OPTION.

> *Held*, that lessee is entitled to a land contract from lessor according to the terms of the option.

10. VENDOR AND PURCHASER—INTEREST ON DEFERRED PAYMENTS NOT IMPLIED WHERE NOT PROVIDED.

> Where the option to purchase did not provide for interest on the deferred payments, none will be implied under the situation shown.

Appeal from Wayne; Cross (Orien S.), J., presiding.     Submitted January 10, 1924.     (Docket No. 33.)     Decided June 2, 1924.

Bill by Boleslaus E. Polczynski against Victoria Nowicki and another for the specific performance of an option to purchase contained in a lease. From the decree rendered, plaintiff appeals. Modified and affirmed.

*Miller, Baldwin & Boos* and *Benjamin S. Pagel,* for plaintiff.

*Connolly & Henderson,* for defendant Nowicki.

STEERE, J.   This bill is filed to enforce specific performance of an option clause in a lease given by Victoria Nowicki to Boleslaus E. Polczynski covering certain premises in Hamtramck known as Nos. 2083-2085-2087 Jos. Campau street.   The land covered by the lease is rectangular, having a frontage of 60 feet on said street and depth of 100 feet.   It has upon it a two-story brick veneer building covering 55 feet of the front, divided into three stores, or places of business, with a living apartment above each and basement beneath.   The lease of these premises ran for six years from May 1, 1919, the total rental being $18,000 payable in monthly installments of $250 "on the first to fifth day" of each month.   The option clause in the lease reads as follows:

"It is mutually understood and agreed that in consideration of the leasing of said premises as aforesaid, the said lessor hereby grants unto said lessee, his heirs, executors and assigns, the option for two years beginning May 1, 1919 to May 1, 1921, purchase said premises for the sum of $30,000 payable $10,000 on the date of the election to exercise said option and the balance in yearly installments of $3,000; said option to be exercise(d) on or before the expiration of the term herein granted."

Mrs. Nowicki is the contesting defendant.   The Michigan State Bank was made a nominal party de-

fendant by reason of recorded mortgage security it held covering the property and, evidently having no interest in this controversy, did not appear or plead but allowed the bill to be taken as confessed against it.

After the lease was given plaintiff took possession of the property, regularly paid Mrs. Nowicki the stipulated rent from month to month, spent over $4,200 in repairs upon the building, and in addition $651.67 for insurance. In company with his brother he established a profitable hat business there, doing a gross business in one of the stores during the first year (1919) of $16,555.80, which by 1922 had grown to $36,472.90 for that year. When he leased the premises defendant was receiving a total monthly rental of $195, for the entire building.

Both parties to this litigation are residents of Detroit, of Polish ancestry and conversant with the Polish language. Both have lived in or near Detroit for over 30 years. Defendant is 55 years of age, and testified that she came to America when 22 years old, attended school in the old country four years, beginning when about nine years old, could read Polish but could not read, write, talk nor understand the English language when spoken. She had lived most of the time in Hamtramck where her husband, who died in December, 1917, ran a saloon for 22 years. Plaintiff had been educated in the common schools of this country, spoke both languages equally well, was a business man of Detroit and had for some years been dealing in electrical equipment and doing electrical construction work, occupying for about 12 years a building on Chene street and Forest avenue.

In the last of January, 1921, plaintiff called on defendant and notified her of his purpose to purchase the property according to his option, requested her to have the papers prepared, or he would do so if she wished, and that he would be ready to make the tender

or first payment the following day. She refused to recognize the option and informed him she would not sell the property. He then had papers prepared and, accompanied by three witnesses who understood Polish, went to her place of business, having with him ten $1,000 bills and the requisite papers to consummate his purpose prepared for execution. He advised her of the purpose of his visit and made tender of the first payment although the ceremony was somewhat curtailed by her refusal to listen and belligerent demonstrations against him when she learned the object of his visit.

One of the grounds of defense urged in her counsel's brief is that no tender was made "strictly as called for by this option." The testimony of what occurred is practically undisputed. Plaintiff details it graphically. His witness Domzalski who lived in Detroit, had been in the real estate and insurance business for over 20 years, and on a former occasion had done some business for defendant and her husband, testified he saw the papers and ten $1,000 bills Polczynski had with him that day, that "he laid it on the bar there, and offered to give her the money as first payment on the property," that he himself told her what the papers were and explained it to her in Polish, but she was angry at all of them and refused to accept the tender or do anything. Plaintiff's witness Skryzki, a member of the Detroit city plan commission who spoke Polish, testified that he saw plaintiff offer her the ten $1,000 bills and they attempted to explain it to her but she "simply refused to do business" and "did not want to have anything to do with us," and "things got a little warmer every minute and then I looked around." Asked what he meant by that, he replied: "I was standing there, and she took hold of a broom and tried to hit Polczynski with the broom and the broom was so close to me I had to kind of look out." Defendant's own

witness Jezewski testified of that feature of the interview:

"He brings out envelopes he has in his pocket and lays one down on the bar, he says: 'Here is your $10,000;' and when he laid that $10,000, I remember Mrs. Nowicki went for broom and said: 'Drink your drinks and get right out.' "

Whether they complied with the first portion of her mandate the record does not make clear, but they did find it advisable to get out. The testimony shows conclusively a legal tender to her of $10,000 in currency, accompanied by a prepared deed for her signature and mortgage from him, with notes, for the unpaid part of the balance of the purchase price, and also a full form land contract following the terms of the option, with tax and insurance clauses, and interest at 6% on deferred payments, ready for execution to be used if she so preferred. The nature of the documents was told with explanations of their contents and purpose so far as she would permit. On commencement of this suit plaintiff continued the tender by depositing the $10,000 with the court and expressly reaffirming all terms of the tender in his pleadings.

As stated by the trial court the real and controlling question in the case is whether defendant fully understood "she was signing an option" or only "thought it was simply a lease." The court sustained the lease in all its provisions except the option clause. Plaintiff tells a plain and connected story of a business transaction with no fiduciary relations between the parties, ending in a written agreement admittedly signed by them at the home of defendant's brother-in-law, Walter Nowicki, and witnessed by the latter and his wife, Theresa. His written and oral proofs make out a clear case entitling him to the relief asked, unless defendant's claim that she did not know the lease she signed contained a clause giving plaintiff

the right to purchase the property for $30,000 within two years after the first of the ensuing May, is plainly shown by convincing evidence which negatives the presumptions attending the voluntary execution of a witnessed instrument in writing.

She urges in support of her claim that she did not understand what she was signing, ignorance of the English language, inexperience in business matters and plaintiff's claimed statement to her that the clause gave him only the first chance to buy the property if she later concluded to sell it. She came to this country when a young woman, and for over 33 years has lived in and near Detroit. Her husband and other members of her family all spoke English. Her activities were not exclusively confined to care of their home as a housewife. She was interested in her husband's business affairs, helped him in operating his saloon and the property which they purchased from time to time was taken in both their names as tenants by entirety. All of it which they had not sold became absolutely hers at his death, and she thereafter continued in a somewhat analogous business running what is called a "near-beer saloon." She testified that she could neither read, write, speak or understand English, and is the only one of the many Polish witnesses in this ample record for whom an interpreter was sworn. But, conceding her claimed inability in that direction, it was no handicap in her negotiations with plaintiff, which were all conducted in the Polish language. When they reached an agreement and were ready to close the deal by executing the papers legally evidencing it they went for that purpose at her suggestion to the home of her brother-in-law, among her friends and relatives, who spoke both languages. The papers were not signed until they had been read over in English and explained to her in Polish by her brother-in-law whom she had talked with about the matter and who was looking after her

interest.    He is shown to have been a notary public, a real estate and insurance agent, and since 1914 in the government service as a deputy collector of internal revenue, in which capacity his superior pronounced him a capable officer.

On the evening the papers were executed at Nowicki's home they were carefully gone over, and the whole subject discussed and some changes made before they were signed.    While there is disagreement in certain particulars as to what was said, there can be no disagreement as to what they signed there after a thorough canvass of the subject, with Nowicki acting for defendant, advising and consulting with her, and dealing at arm's length with plaintiff.    The conversation was carried on mostly in the Polish language but the lease was carefully read through in English by Nowicki's daughter and explained as they went along to defendant by Nowicki in Polish.    He manifestly examined it carefully, discussing different paragraphs and suggesting some minor changes such as the number of the street and "lessee" where "lessor" had been inadvertently used.    When he came to the option clause as originally written, which extended through the five years of the lease, he called attention to it and, as plaintiff states, "said the leasing was all right, five years, but the option was too long, he would not consider that fair."    Nowicki states he said "Isn't that too long for first chance?"    Plaintiff replied that if the time in the option clause was shortened he wanted the life of the lease extended. They finally agreed that the lease should be for six years and the time in the option clause for two.    The change of time was then written in the option clause with a pen as shown in the original copies by Nowicki's daughter, a young woman 20 years of age who had been educated in the common schools of this country. After the word option, "to" was marked out and "for two years beginning May 1, 1919 to May 1, 1921"

written in. To correspond with this they had her change in a preceding paragraph the five years to six and the total rent for the full period from $15,000 to $18,000. The parties are at variance as to what further was said in connection with this option clause. It is claimed for defendant that plaintiff told them in Polish that it only meant if she wanted to sell within that time he would have the first chance. This plaintiff denied, and testified that Nowicki fully explained its meaning to her in Polish, telling her that it gave plaintiff the right to purchase during that time on the terms stated and she should not feel sorry if plaintiff presented her the cash to buy the building for she would have to sell if he did so, mentioning in that connection the Kopelczak case which he said "was supposed to be similar to this here" (*Nowicki* v. *Kopelczak,* 195 Mich. 678), telling her he didn't wish for anything of that kind "to come up." His explanation of the $30,000 purchase price left in the option clause is that plaintiff said he would not give any more than that amount, and if she wanted to sell for that sum he would have the first chance.

"*Q.* You also changed it from five to two years?
"*A.* Yes, we have changed that.
"*Q.* The option?
"*A.* Yes.
"*Q.* You talked about $30,000.00?
"*A.* Very little we talked about that.
"*Q.* What did you think that was, what kind of an agreement did you think that was?
"*A.* I thought it was hardly any agreement, that, just took to his honesty, that is all. * * * The only thing he wants to have protection so if some one want to buy the place there he would have the first chance, by him having the lease of that property."

After the lease had been gone over and explained to defendant in Polish in connection with their discussion and these changes had been made as agreed upon, the

instrument was signed and witnessed, Nowicki stating "She signed when I told her to."

Defendant's testimony is reckless and in many respects self-contradictory. She stated that on the evening they signed the lease plaintiff explained that the provision in it relating to purchase only meant that he should have the first chance in case she decided to sell, to which she agreed, and later positively asserted that the lease was not read or explained to her at all that night. On cross-examination she was asked and answered:

"*Q.* Walter Nowicki swore on the stand that his daughter read the lease in English, that the same was explained to you in Polish?

"*A.* I do not remember.

"*Q.* You do not remember—well, you swear that it was not done, now—did any one explain the lease in Polish to you?

"*A.* No.

"*Q.* No one explained it to you at all?

"*A.* No.

"*Q.* Walter Nowicki wasn't telling the truth when he said his daughter did?

"*A.* I do not remember.  *  *  *

"*Q.* Do you remember the figure of $30,000 having been agreed upon?

"*A.* No, I do not.

"*Q.* Do you remember your brother-in-law, Walter Nowicki, telling you about the $30,000?

"*A.* I do not remember.

"*Q.* You won't swear that he didn't discuss with you the purchase price of $30,000, will you?

"*A.* No."

The lease containing the option was made out and executed in duplicate. Defendant received her copy that night and took it home with her.

Shortly after that, in April as he thought, a tenant who occupied one of the stores in the building for an undertaking establishment and whose lease was about to expire, went to see her to obtain a renewal. He testified:

"I could not get it.   I·wanted a lease on it, and she said he (Polczynski) got an option on the property for the amount of $30,000 with the amount of $10,000 down."

On cross-examination:

"*Q.* You say Mrs. Nowicki told you that Mr. Polczynski had an option?
"*A.* Yes, sir.
"*Q.* Did she use the word 'option?'
"*A.* She said an option.
"*Q.* She said 'option?'
"*A.* Option.
"*Q.* Did she say what an option was?
"*A.* That is for the property, option, that was the option on the property.
"*Q.* Yes, what is an option?
"*A.* An option for sale of building in such a length of time.
"*Q.* Means a sale?
"*A.* That a buyer, for instance, in real estate, takes an option on the property, and nobody can touch it but the man who has got the option on it.   *    *    *
"*Q.* What were you going to pay for the building?
"*A.* When she told me that Mr. Polczynski is the first one to lease the building, and have an option, not use talking any further."

A Polish real estate agent who had learned that defendant had other lots lying beyond the Caniff road on Jos. Campau street testified that he visited her twice at her place of business early in 1919 to learn if she would sell them; that the first time he saw her she intimated she would not sell them but finally gave a price which he considered too high, and the second time he called she told him that she had sold the property in question here to Polczynski and if she got the money she intended to start to build on the lots she had beyond Caniff, his understanding being from what she told him that plaintiff had an option.

"If he don't want to buy it, he don't have to buy it, but the seller has to sell it,—the way I understand it.

"*Q.* Did she know what she was talking about when she was talking to you?

"*A.* Absolutely she did, she did know that Mr. Polczynski wanted the property, then she had to sell it, that is the way.

"*Q.* She knew that?

"*A.* She knew that.

"*Q.* That if Mr. Polczynski wanted it, she had to sell it?

"*A.* Yes.

"*Q.* Is she a bright Polish woman?

"*A.* Quite bright, yes."

Neither of these witnesses was related to the parties or had any pecuniary interest in this litigation.

Plaintiff made no secret of the fact that he held an option on the property and intended to exercise it. Defendant's witness Stonert, who was dealing in real estate in Hamtramck and wanted to get an option on this or her vacant property, testified that early in 1919 Polczynski told him that he had an option and says:

"I went to Mrs. Nowicki to find out whether Mr. Polczynski has an option to sell that property, and if she leased that, she said: 'I leased that property to him and he has not got it for sale,' and another thing, when she told me that, then, I could do nothing any more. She said she could not sell it because of the lease."

The option in the lease was the only reason why she could not sell it if so disposed.

The first flurry over this option was some three or four months after it was executed, as she states, when her son Mike who had returned from army service heard some parties talking of it, and "come running home" to ask his mother about it, telling her he understood she gave Polczynski some kind of an option on something that he "can buy it any time he wants to," to which she replied, as he states, that she "never did," but had given him a lease for six years.

Mike times this event as early in December, 1920. He stated that he then took the copy of the lease to an attorney—she said that she sent him—and the attorney advised them that plaintiff "did have the right to buy under that specification." Thus informed of the claimed fraud, she took no steps in the matter, waiting as Mike testified under the attorney's advice to see if plaintiff did anything before the two years expired. She made no protest on the subject to plaintiff and accepted his monthly payments of rent up to and including January, 1921, first denying the option when he notified her on the last of that month of his intention to exercise it.

It is contended for defendant that the price plaintiff had put in the option was less than it was then worth and less than she had been offered for it. We do not find those contentions sustained by convincing testimony. The party claimed to have made such offer denies it. Before his death defendant's husband had offered the property for $25,000 without finding a purchaser and, though values had increased some since his death, at the time this lease was made the building was in poor condition, needing extensive repairs, and the serious post-war reaction in business had checked real estate activities and depressed values in that locality. The president of the First State Bank of Hamtramck, who testified to a familiar knowledge of the value of construction work and land in that locality, stated there was a slight scare as to and depression in values of property during the fore part of 1919, there were quite a few vacant store properties and not much buying and selling of business property. He appraised this property as worth about $30,000 in the condition it was at that time and good for a loan of about $12,000, although it was mortgaged for more than that amount at the time the lease was given. Nowicki, who had been in the real estate business with his name listed in the Detroit

Polk Directory as such, raised no question as to the $30,000 price stated in the option clause, when he criticized and had it changed in other particulars.

Defendant was not without experience in, nor totally ignorant of business. She made her own bargain and took the precaution to have Nowicki present when the papers were executed to see that her interests were protected. He was an experienced man and public official capable of reading, interpreting and explaining them to her, which he testified that he did, although in his loyalty to her he was willing to stultify himself in attempting to sustain her contention. When they came to the option clause it is undisputed that he raised an objection to the length of time it was to run, and it was shortened from five to two years. To conform with defendant's claim that she only agreed to give plaintiff the first chance to buy if she wanted to sell he testified that he protested it was "too long for first chance," but was unable to explain why the life of the lease was too long or what difference it made to her if she was not under any obligations to sell at all, for the stated price to which he made no objection, or at any other price. There was nothing obscure, unfair or uncertain in this option before or after it was changed by his daughter to meet his objection. It was in a single paragraph of the lease, in plain language, easy to read and understand.

Defendant's capacity to understand and independently contract in relation to the various other important provisions found in the written agreement is not questioned. They were approved by Nowicki and sustained by the court. To agree upon a purchase price and time within which the purchase might be made would seem to require no higher degree of business experience or understanding. A careful consideration of the testimony as a whole found in this voluminous record is persuasive that defendant's

attempt to repudiate the option clause in this lease is an afterthought inspired by enhanced value of the real estate since this lease was given. The written instrument which these parties deliberately executed under the circumstances shown here is the best evidence of what their agreement was, and should control.

The two further contentions are made for defendant that the option is incomplete because no interest on deferred payments is specified, and no provision for delivery of possession, in which case this court has held that the purchaser is not entitled to possession until the full purchase price is paid. This court has also held that failure to specify interest does not invalidate the contract. *Elbom* v. *Pavsner,* 225 Mich. 213. Plaintiff was in possession when he made tender on February 1, 1921, and has so continued without paying rent since that time, apparently on the theory that the tender changed the character of his possession as a tenant to that of purchaser. His contract does not so provide and it is a well settled rule that if not otherwise provided in the agreement the right to possession of a contract purchaser does not become operative until full payment of the purchase price. *Gault* v. *Stormont,* 51 Mich. 636; *Way* v. *Root,* 174 Mich. 418; *Brin* v. *Michalski,* 188 Mich. 400; *Barton* v. *Molin,* 219 Mich. 347. Though in default for past due rent defendant has not dispossessed him nor forfeited his lease, and he is entitled upon payment of rent in arrears to continue his tenancy under the lease. Her claim that the lease is at an end because of plaintiff's attitude in this litigation is not tenable. He is entitled to a land contract from her according to the terms of the option. No interest to her on deferred payments being provided, none will be implied under the situation shown here. He now offers to pay the purchase price in full with interest on all deferred payments since the time of the tender.

That is a matter between the parties.    Courts cannot make contracts for them.

The decree of the lower court sustaining the lease except as to the option it contained will be modified to include the option, and specific performance as to it decreed, with costs to plaintiff.

CLARK, C. J., and McDONALD, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.